**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CLOVER COMMUNITIES BEAVERCREEK, LLC, et al.,
individually and as assignees of the claims of CNY Fair
Housing, Inc. et al.,                                    5:22-cv-278 (BKS/ML)

                                    Plaintiffs,

v.

MUSSACHIO ARCHITECTS P.C. and MARC
MUSSACHIO,

                                    Defendants.

**Appearances:**

*For Plaintiffs:*
Elizabeth A. Kraengel
Gregory P. Photiadis
Duke Holzman Photiadis & Gresens LLP
701 Seneca Street, Suite 750
Buffalo, NY 14210

*For Defendants:*
Conor V. McDonald
Christopher Albanese
Milber Makris Plousadis & Seiden, LLP
100 Manhattanville Road, Suite 4E20
Purchase, NY 10577

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

        Plaintiffs, twenty-eight entities who own senior housing complexes, filed an amended

complaint against Defendants Mussachio Architects P.C. and Marc Mussachio alleging claims

for breach of contract; professional malpractice; contribution under New York Civil Practice

Law and Rules ("CPLR") 1401; violation of the Fair Housing Act of 1968 ("FHA"), as amended,

42 U.S.C. § 3601 et seq.; violation of the New York State Human Rights Law ("NYSHRL"),

N.Y. Exec. Law § 296 et seq.; violation of Ohio's unlawful discriminatory practices statute, Ohio

Rev. Code § 4112.02 et seq.; violation of Indiana Fair Housing Law, Ind. Code § 22-9.5-5-5 et

seq.; and violation of Kentucky unlawful housing practices, Ky. Rev. Stat. § 344.360 et seq.

(Dkt. No. 71).[1] Presently before the Court is Defendants' motion to dismiss the amended

complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. No. 74). The

motion is fully briefed. (Dkt. Nos. 75, 76). For the following reasons, the Court grants

Defendants' motion to dismiss in part.

## II.    BACKGROUND

### A.    Procedural Background

This action was commenced in March 2022 by a group of Fair Housing Organizations

(the "Original Plaintiffs")[2] alleging violations of the FHA and NYSHRL against Defendants, the

property manager, contractors, and various property owners. (*See generally* Dkt. No. 1). The

Original Plaintiffs alleged that the original defendants "designed or constructed, or own[ed] or

operate[d] multi-family rental housing complexes that do not comply with the FHA's

accessibility requirements." (*Id.* ¶ 1). On August 4, 2022, the present Plaintiffs and others settled

the claims against them with the seven Original Plaintiffs as well as five additional Fair Housing

Groups. (*See* Dkt. No. 71-1 (Settlement Agreement dated August 4, 2022)).[3] Plaintiffs agreed to

---

[1] A list of Plaintiffs and the properties associated with each is set forth in the appendix to this memorandum-decision and order.

[2] The Original Plaintiffs are CNY Fair Housing, Inc.; Housing Opportunities Made Equal of Buffalo, Inc.; Housing Research & Advocacy Center, Inc., d/b/a Fair Housing Center for Rights & Research, Inc.; Fair Housing Opportunities of Northwest Ohio, d/b/a The Fair Housing Center; Housing Opportunities Made Equal of Greater Cincinnati, Inc.; Fair Housing Center of Central Indiana, Inc.; and The Fair Housing Partnership of Greater Pittsburgh, Inc. (*See* Dkt. No. 1).

[3] The five additional Fair Housing Groups are Fair Housing Resource Center, Inc.; Miami Valley Fair Housing Center, Inc.; Lexington Fair Housing Council, Inc.; Fair Housing Advocates Association, Inc.; and Fair Housing Contact Service, Inc. (*See* Dkt. No. 71, ¶¶ 45–49; Dkt. No. 71-1, at 2).

(1) undertake a number of "alterations to improve accessibility for the exterior of the Properties" set forth in a "Punch List" and with an estimated value of at least $3 million; (2) provide an "Individual Unit Modification Fund" to be used for individual unit modifications requested by residents or potential residents on account of disability; and (3) make a settlement payment to the Fair Housing Groups in the amount of $750,000. (*Id.* at 6–15). The settlement agreement expressly excluded all claims against Defendants Mussachio Architects, P.C. and Marc Mussachio, who were not parties to the agreement. (*Id.* at 18 ("Nothing in the above releases shall be construed as any party to this Agreement releasing any claims . . . that any party to this Agreement may have against Mussachio Architects, P.C., or Marc Mussachio.")).

Subsequently, on August 17, 2022, the Original Plaintiffs and the five additional Fair Housing Groups (collectively, the "Assignors") assigned to Plaintiffs, "as it relates to the subject housing complex owned by each [Plaintiff]," "all right, title to and interest in (1) all of the claims and causes of action the [Assignors], or any of them, have against Mussachio Architects, P.C. and Marc Mussachio" that are set forth in the original complaint in this action, and (2) "all of the claims and causes of action the [Assignors], or any of them, may have against [Defendants] for design and construction-related violations of the FHA" relating to the identified properties. (Dkt. No. 71-2, at 2 (Assignment)).

By Text Order dated February 14, 2023, Magistrate Judge Miroslav Lovric granted Plaintiffs leave to file an amended complaint. (Dkt. No. 70).

B.      Amended Complaint[4]

The amended complaint alleges that Plaintiffs entered into various written contracts with

Mussachio Architects, P.C., of which architect Marc Mussachio is a principal, between August 2,

2010 and September 9, 2021 to "perform certain design services" relating to housing complexes

as set forth in each contract. (Dkt. No. 71, ¶¶ 51–52, 61–94); *see also* Appendix. These contracts

were "in the form of AIA Document B102-2007 (Standard Form of Agreement Between Owner

and Architect without a Predefined Scope of Architect's Services) and AIA B201-2007

(Standard Form of Architect's Services)." (Dkt. No. 71, ¶¶ 61–94). Each contract provides that

Mussachio Architects "shall perform its services consistent with the professional skill and care

ordinarily provided by architects practicing in the same or similar locality under the same or

similar circumstances." (*Id.* ¶ 120). Each contract further provides that Mussachio Architects

"shall incorporate the design requirements of governmental authorities having jurisdiction over

the Project into the Construction Documents." (*Id.* ¶ 121). Plaintiffs allege that each contract

required Mussachio Architects to visit the subject site at "appropriate" intervals, "keep the

Owner reasonably informed about the progress and quality of the portion of the Work

completed," and "promptly report" "known deviations" and "defects and deficiencies observed."

(*Id.* ¶ 122). Contracts entered into after August 2019 "incorporated provisions expressly

referencing FHA as applicable to the Projects." (*Id.* ¶¶ 124–26).

Plaintiffs allege that "each unit at each Project" and the "public and common use areas of

each Project" are all subject to the FHA's accessibility requirements. (*Id.* ¶¶ 104–07). However,

"[m]ultiple features" designed by Defendants "do not comply with the FHA" and other

---

[4] These facts are drawn from the amended complaint and the attached exhibits. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

accessibility guidelines and standards. (*Id.* ¶ 108). On August 29, 2019, counsel for the Original

Plaintiffs sent a letter to certain Plaintiff entities and Mussachio Architects, "placing them on

notice of the alleged design and construction violations under the FHA at various properties" and

demanding that they be remedied. (*Id.* ¶ 109). "All Mussachio designs" following this letter were

also "non-compliant with FHA requirements." (*Id.* ¶ 110).

More specifically, Plaintiffs allege that Defendants "defectively designed accessible

routes to: interior amenities in interior common use areas as required by the FHA," balconies,

and patios. (*Id.* ¶ 112). Defendants also designed bathrooms that are not accessible because they

"lack required clear floor space" and do not have reinforced walls that "allow the installation of

grab bars." (*Id.* ¶¶ 113–14). Defendants "also designed mailboxes that do not comply with the

FHA's accessibility requirements." (*Id.* ¶ 115). Plaintiffs allege that they have incurred (1)

"extensive remediation costs to fix the FHA design and construction violations Defendants

created," (2) "defense costs" related to "the litigation to which those violations gave rise," and

(3) as to defects not capable of correction, the "difference in value between properly constructed

buildings and those that were in fact built." (*Id.* ¶¶ 3, 129).

The amended complaint asserts direct claims for: (1) contribution under CPLR 1401 for

"an amount [of Plaintiffs' settlement with the Assignors] commensurate with Defendants['] own

negligence or wrongdoing, up to 68%" of damages paid; (2) breach of contract against

Mussachio Architects; and (3) professional malpractice against both Defendants, (*id.* ¶¶ 118–43),

and assigned claims for violation of the FHA, NYSHRL, Ohio's unlawful discriminatory

practices statute, Indiana Fair Housing Law, and Kentucky unlawful housing practices, (*id.*

¶¶ 144–61).

## III.    STANDARDS OF REVIEW

Rule 12(b)(1), which provides that a court may dismiss a claim for lack of subject matter jurisdiction, is the proper procedural route to bring a standing challenge. *All. for Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006); *see also Lyons v. Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (noting that a lack of standing "may be addressed through a Rule 12(b)(1) motion"). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). A defendant may make "a fact-based Rule 12(b)(1) motion, proffering evidence beyond the complaint and its exhibits." *Nicholas v. Trump*, 433 F. Supp. 3d 581, 586 (S.D.N.Y. 2020) (citation omitted). A plaintiff must then "come forward with evidence of [its] own to controvert that presented by the defendant, or may instead rely on the allegations in [its] [p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017) (citation and internal quotation marks omitted). The "party invoking federal jurisdiction bears the burden of establishing" the elements of Article III standing. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (citation omitted).

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all

reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.    DISCUSSION

Defendants move to dismiss the amended complaint in its entirety, arguing that (1) all of Plaintiffs' claims are preempted by the FHA, (2) Plaintiffs lack standing to assert the assigned claims, and (3) alternatively, that certain of Plaintiffs' breach of contract and professional negligence claims are time-barred. (*See generally* Dkt. No. 74-52).

### A.    Preemption

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "From this constitutional principle, it follows that 'Congress has the power to preempt state law.'" *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). In general, there are three types of preemption: express preemption, field preemption, and conflict preemption. *See Williams v. Marinelli*, 987 F.3d 188, 198 (2d Cir. 2021). Here Defendants seek dismissal based on conflict preemption.

Conflict preemption refers to "situations where compliance with both state and federal law is a physical impossibility" or, as relevant here, to situations "where the state law at issue 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Marentette v. Abbott Lab'ys, Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (quoting *Arizona*, 567 U.S. at 399). "What constitutes a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* (quoting *In re MTBE*, 725 F.3d at 101) (internal quotation marks omitted).

"[F]ederal law does not preempt state law under obstacle preemption analysis unless 'the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together.'" *In re MTBE*, 725 F.3d at 102 (citation omitted)).

As in all preemption cases, the "purpose of Congress is the ultimate touchstone." *Williams*, 987 F.3d at 198. Courts "have long presumed that Congress does not cavalierly pre-empt state-law causes of action" and therefore start with the "assumption that the historic police powers of the States were not to be superseded by [a federal law] unless that was the clear and manifest purpose of Congress." *Marentette*, 886 F.3d at 117 (first quoting *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996); and then quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)).[5] The party "asserting that federal law preempts state law bears the burden of establishing preemption." *Id.* (citation omitted).

## 1. Direct Claims

### a. Contribution

#### i. Plaintiffs' Contribution Claim Under NY CPLR § 1401

Plaintiffs bring their contribution claim under CPLR 1401 which provides, with certain exceptions, that "two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought." N.Y. CPLR 1401. Courts agree that there is no express or implied right to indemnification or contribution under the FHA itself. *See United States v. Murphy Dev., LLC*, No. 08-cv-960, 2009 WL 3614829, at *1, 2009 U.S. Dist. LEXIS 100149, at

---

[5] Defendants do not argue that this presumption against preemption does not apply here. *See City of Los Angeles v. AECOM Servs., Inc.*, 854 F.3d 1149, 1158–60 (9th Cir. 2017) (rejecting argument that the presumption against preemption was inapplicable to the Americans with Disabilities Act ("ADA")).

*7–8 (M.D. Tenn. Oct. 27, 2009) (noting that the federal courts that have considered the question "are in universal agreement that there is no express or implied right to indemnity or contribution under the FHA" and collecting cases); *Mathis v. United Homes, LLC*, 607 F. Supp. 2d 411, 419–23 (E.D.N.Y. 2009) (concluding that there is no federal right to contribution and/or indemnity under the FHA). Plaintiffs, whose contribution claim is expressly brought under CPLR 1401, do not argue otherwise.

Further, the Second Circuit has stated that it is "settled in this Circuit that there is no claim for contribution unless the operative federal statute provides one," and that the "source of a right of contribution under state law must be *an obligation imposed by state law*." *In re Bernard Madoff Inv. Sec. LLC*, 721 F.3d 54, 65–66 (2d Cir. 2013) (citations omitted). The settlement agreement here, however, resolved Plaintiffs' liability under both the FHA and NYSHRL, (Dkt. No. 71-1, at 16), and contribution "may be available under New York State law with regard to claims brought under N.Y. Exec. Law § 296," *Firestone v. Berrios*, 42 F. Supp. 3d 403, 420 (E.D.N.Y. 2013) (citations omitted); *see also Mathis*, 607 F. Supp. 2d at 430 (noting that owners' claims for contribution "could be founded on every state law cause of action asserted by the plaintiffs," including violations of NYSHRL).[6]

### ii.    Analysis of the Contribution Claim

Defendants argue that the FHA preempts Plaintiffs' claim for contribution under New York law because (1) allowing contribution under state law would frustrate the purpose of the FHA and (2) Plaintiffs' contribution claim is in reality a claim for indemnification, which is also preempted. (Dkt. No. 74-52, at 13–16). Plaintiffs respond that their claim for contribution is not

---

[6] The Court has not addressed issues regarding the applicability of New York State contribution law that were not raised by the parties. *See KBL Corp. v. Arnouts*, 646 F. Supp. 2d 335, 342–43 (S.D.N.Y. 2009).

preempted by the FHA, arguing that the allocation of liability for violations of fair housing laws among responsible parties does not undermine the FHA's purpose. (Dkt. No. 75-1, at 11–15).

As relevant here, the FHA makes it unlawful: to "discriminate in the sale or rental" of a dwelling or to "otherwise make unavailable or deny" a dwelling "because of a handicap," 42 U.S.C. § 3604(f)(1); and to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling" because of a handicap, *id.* § 3604(f)(2). *See also id.* § 3604(f)(3)(C) (defining "discrimination" to include a "failure to design and construct" covered dwellings in accordance with certain accessibility standards); *cf. S&R Dev. Estates, LLC v. Town of Greenburgh*, 336 F. Supp. 3d 300, 310 (S.D.N.Y. 2018) ("The FHA penalizes actions that, in any way, 'make unavailable' any dwelling to any person 'because of race, sex, familial status, or national origin.'" (quoting 42 U.S.C. § 3604(a))). The declared policy of the FHA is "to provide . . . for fair housing throughout the United States." 42 U.S.C. § 3601. As explained by the Supreme Court, Congress enacted the FHA "to eradicate discriminatory practices within a sector of our Nation's economy." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 539 (2015) (citations omitted); *see also Fair Hous. Justice Ctr., Inc. v. JDS Dev. LLC*, 443 F. Supp. 3d 494, 502 n.2 (S.D.N.Y. 2020) (citing the Act's legislative history, which states that the Act "is a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream"). The amended complaint alleges that Defendants discriminated by "fail[ing] to design dwellings in compliance with the requirements mandated by 42 U.S.C. § 3604(f)(3)(C) and the applicable

regulation." (Dkt. No. 71, ¶ 145).[7] The FHA is "results-oriented" and emphasizes the

consequences of an actor's actions, rather than his or her intent. *S&R Dev. Estates*, 336 F. Supp.

3d at 310; *see also Fair Hous. Justice Ctr. Inc. v. Lighthouse Living LLC*, No. 20-cv-4066, 2021

WL 4267695, at *5, 2021 U.S. Dist. LEXIS 181505, at *14 (S.D.N.Y. Sept. 20, 2021) (noting

that "liability under the FHA for discriminatory design and construction is imposed broadly" and

that "any entity who contributes to a violation" may be liable (citations omitted)).

The Second Circuit has not addressed whether the FHA preempts a state-law claim for

contribution, and the parties rely on cases from other Circuits. In *Equal Rights Center v. Niles

Bolton Associates*, the owner and developer of multi-family housing projects, after settling a

lawsuit commenced by advocacy groups for violations of the FHA and the ADA, filed cross-

claims against the architect for express and implied indemnity, breach of contract, and

professional negligence under state law. 602 F.3d 597, 598–99 (4th Cir. 2010). The Fourth

Circuit held that allowing these cross-claims would undermine the purposes of the FHA and

ADA and therefore that the claims were preempted. *Id.* at 601–02. The court first noted that the

"goals of the FHA and ADA are 'regulatory rather than compensatory'" and that the "primary

purpose of the FHA is 'to provide . . . for fair housing throughout the United States.'" *Id.*

(quoting 42 U.S.C. § 3601). Compliance with the FHA is "nondelegable" in that an owner

cannot "insulate himself from liability" by "relinquishing the responsibility for preventing . . .

discrimination to another party." *Id.* at 602 (citation omitted). Thus, "[a]llowing an owner to

completely insulate itself from liability for an ADA or FHA violation through contract

diminishes its incentive to ensure compliance with discrimination laws," and the owner's

---

[7] The original complaint alleged that the original defendants likewise failed to design and construct dwellings in compliance with 42 U.S.C. § 3604(f)(3)(C) as well as discriminated against or made unavailable dwellings to persons with disabilities in violation of 42 U.S.C. §§ 3604(f)(1) and (f)(2).

indemnification claims were preempted. *Id.* The Fourth Circuit further held, in light of the fact

that the owner sought to recover "100% of the losses" at the sites where the architect provided

services, that the owner's breach of contract and negligence claims were similarly preempted

because they were simply de facto indemnification claims that "derived from violations of" the

FHA and ADA. *Id.* The court expressly declined to "reach the question of whether a state-law

claim for contribution is preempted under federal law." *Id.* at 604 n.2.

A number of district courts have applied the reasoning of *Niles Bolton* to conclude that

state-law claims for contribution, as well as indemnification, are preempted by the FHA. In

*Murphy Development*, for example, the court concluded that the property owner's third-party

state-law claims for indemnity and/or contribution were preempted because "allowing recovery

under state law for indemnity and/or contribution," where such recovery is not available under

the FHA, "would frustrate the achievement of Congress' purposes in adopting the FHA." 2009

WL 3614829, at \*2, 2009 U.S. Dist. LEXIS 100149, at \*9; *see also Miami Valley Fair Hous.*

*Ctr., Inc. v. Campus Vill. Wright State, LLC*, No. 10-cv-230, 2012 WL 4473236, at \*7, 2012 U.S.

Dist. LEXIS 137922, at \*16–17 (S.D. Ohio Sept. 26, 2012) (concluding that developers' state-

law indemnification and contribution claims against architect were barred by obstacle

preemption because allowing the developers to insulate themselves from liability is "contrary to

the goal of the FHA—namely to provide fair housing in the United States"); *United States v.*

*Dawn Props., Inc.*, 64 F. Supp. 3d 955, 960 (S.D. Miss. 2014) (agreeing that the FHA

"preempt[s] state law claims for both indemnity and contribution").

In 2017, the Ninth Circuit held that the ADA and the Rehabilitation Act ("RA") did not

preempt "a city's state-law claims for breach of contract and *de facto* contribution against

contractors who breach their contractual duty to perform services in compliance with federal

disability regulations." *City of Los Angeles*, 854 F.3d at 1152.[8] There, after two disabled

individuals sued the City of Los Angeles, the City filed a third-party complaint against the

successors-in-interest to two contractors the City had hired to design and/or construct the bus

facility alleged to be inaccessible. *Id.* The City brought claims for breach of contract and express

contractual indemnity based on contractual language pursuant to which the contractors agreed to

"defend, indemnify and hold City . . . harmless" to the extent that any claim "results from the

negligent and/or the intentional wrongful acts or omissions of [the contractor]." *See id.* at 1152–

53. On appeal, the Ninth Circuit distinguished *Niles Bolton* and concluded that obstacle

preemption did not preclude the City's claims, which it viewed as "functionally seek[ing]

contribution." *Id.* at 1155–56, 1161. In contrast to the circumstances of *Niles Bolton* where the

developer "sought to allocate the *full* risk of loss" to the architect, the "relevant contractual

provisions assign liability to [the contractors] only to the extent that their own actions give rise to

liability." *Id.* at 1156. The Ninth Circuit thus concluded that the *Niles Bolton* court's "concern

with permitting a responsible party to completely insulate itself" from liability was "not in play,"

and that a "greater concern [wa]s the potential for contractors to shield themselves from any

liability they caused under both state contract law and federal disability regulations." *Id.* The

court also noted that cities "usually have no choice but to contract out design and construction of

public facilities" and therefore that "[p]ermitting enforcement of contract claims seeking to hold

a contract liable for duties necessarily delegated to it does not raise the specter of entirely

insulating public entities from ongoing [ADA or RA] liability posed by offloading all the city's

responsibilities under those laws." *Id.* at 1158. Further, "precluding contract clauses for

---

[8] Like the FHA, the purpose of the ADA is "regulatory rather than compensatory." *See id.* at 1156, 1159–60 (noting that the purpose of Title II of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" (quoting 42 U.S.C. § 12101(b)(1)–(2))).

contribution reduces a contractor's incentives" to ensure full compliance with the federal statutes, which itself "hamper[s] the statutes' regulatory purpose." *Id.* at 1161; *see also Shaw v. Cherokee Meadows, LP*, No. 17-cv-610, 2018 WL 3474082, at *2, 2018 U.S. Dist. LEXIS 120396, at *6–7 (N.D. Okla. July 19, 2018) (finding the reasoning in *City of Los Angeles* persuasive and concluding that the FHA, ADA, and RA "do not preempt contribution crossclaims").

Here, as an initial matter, Defendants argue that Plaintiffs' contribution claim is really one for indemnification because Plaintiffs seek to "recoup 100% of the settlement amount with Original Plaintiffs in connection with the projects that involved [Defendants]." (Dkt. No. 74-52, at 16). Plaintiffs respond that they do not assert an indemnification claim and only seek to recover damages from Defendants to the extent those damages are caused by Defendants' own wrongdoing. (Dkt. No. 75-1, at 12; *see* Dkt. No. 71, ¶¶ 140, 142 (seeking to hold Defendants liable for contribution "in an amount *commensurate with Defendants['] own negligence or wrongdoing*, *up to* 68%" of the remediation and compensatory damages incurred as part of the settlement, "i.e., 34 of the 50 buildings subject [to] the Settlement") (emphases added)). To the extent that Plaintiffs seek to hold Defendants liable only to the extent of their own wrongdoing, the Court agrees that the contribution claim is not in reality a claim for indemnification which would completely insulate Plaintiffs from liability.

Further, the Court finds the reasoning in *City of Los Angeles* persuasive and therefore concludes that the FHA does not preempt Plaintiffs' state-law contribution claim. To the extent Plaintiffs seek to recover only contribution, Plaintiffs minimize the concern present in *City of Los Angeles* that Plaintiffs, responsible parties under the FHA, seek to completely insulate themselves from liability under the Act as to the claims encompassed by the settlement

14

agreement. 854 F.3d at 1156. Although Defendants argue that the purpose of the FHA—the provision of fair housing—would be frustrated if responsible parties such as Plaintiffs could be compensated for losses arising from violations, the same could be said if Plaintiffs' contribution claim were preempted. In that case, Defendants, also alleged violators of the FHA, would be insulated from liability under the Act. *See id.* (expressing concern about "the potential for contractors to shield themselves from any liability they caused"). This would reduce Defendants' incentives to comply with the FHA, which in turn frustrates the objective of the Act to provide fair housing, including by designing and constructing multifamily dwellings in accordance with the Act's accessibility guidelines. *See id.* at 1161 (noting that "precluding contract clauses for contribution reduces a contractor's incentives to do so"); *cf. Williams*, 987 F.3d at 201 (concluding that the deterrent effect of a Section 1983 award "is eviscerated" if the constitutional tortfeasor is "relieved of the bulk of the financial consequences of the violation"). Thus, mindful that the Court starts "with the assumption that the historic police powers of the States were not to be superseded by [a federal law] unless that was the clear and manifest purpose of Congress," *Marentette*, 886 F.3d at 117, the Court concludes that Plaintiffs' contribution claim is not barred by obstacle preemption under the FHA.

**b.    Breach of Contract and Professional Malpractice**

Defendants next argue that Plaintiffs' breach of contract and professional malpractice claims are preempted by the FHA because "they are simply reiterations of an indemnification claim." (Dkt. No. 74-52, at 16–18). Plaintiffs respond that these claims are not preempted because they are "independently grounded" in state law and arise from "obligations independent of the FHA." (Dkt. No. 75-1, at 16–17).

Courts in the Second Circuit have not addressed this issue. As the parties appear to agree, other courts considering whether claims such as breach of contract and professional malpractice

are preempted by the FHA consider whether the claims seek to vindicate an obligation owed

independently of the FHA or whether the claims are merely reiterations of an indemnification or

contribution claim seeking to vindicate FHA violations. In *United States v. Quality Built

Construction, Inc.*, the architectural firm moved for summary judgment on a developer's cross-

claims for breach of contract and breach of the standard of care, arguing that the developer's

claims were "in fact *de facto* claims for indemnification." 309 F. Supp. 2d 767, 779 (E.D.N.C.

2003). The court held that such claims were not allowed to the extent the cross-claimants sought

contribution under the FHA or indemnification for FHA violations. *Id.* However, the court also

noted that the developer hired the architect for its "expertise to perform design services for the

interiors of the units," and it appeared that the architect "had an independent obligation to

perform competently and fulfill the terms of its contract." *Id.* The court therefore denied

summary judgment "with respect to these distinct state law claims which may allow for some

form of contribution." *Id.* Stated differently, courts draw a "distinction between (1) a state-law

claim seeking indemnification or contribution stemming from proven FHA violations and (2) a

state-law contract claim arising from breach of a duty imposed by the particular terms of a

contract, rather than duties imposed by the FHA; or a state law negligence claim based on a

standard of care not imposed by the FHA." *Miami Valley Fair Hous. Ctr.*, 2012 WL 4473236, at

*9, 2012 U.S. Dist. LEXIS 137922, at *23.

The Court concludes that Plaintiffs have plausibly alleged a breach of contract claim that

is sufficiently distinct from an indemnification claim for FHA violations. Although Plaintiffs

allege that Mussachio Architects breached each contract by "failing to provide designs on each

of the Projects that are compliant with [the] FHA," they also allege that Mussachio Architects

breached its contractual duty to inform the owner of each project "of any deviations, defects or

deficiencies." (Dkt. No. 71, ¶¶ 127–28). At this stage of the proceedings the Court does not find that the breach of contract claim is preempted as a de facto indemnification claim. *See Quality Built Constr.*, 309 F. Supp. 2d at 779 (denying summary judgment as to state-law claims premised on an "independent obligation to . . . fulfill the terms of [the] contract"); *cf. Miami Valley Fair Hous. Ctr.*, 2012 WL 4473236, at *10, 2012 U.S. Dist. LEXIS 137922, at *25–26 (finding that the cross-claimants failed to state a breach of contract claim which was "distinct" from FHA violations).

By contrast, the Court fails to see any distinction between Plaintiffs' claim for professional malpractice and an indemnification claim for FHA violations. Plaintiffs allege that Defendants' services "fell below the applicable standard of care" because Defendants "failed to provide designs on each of the Projects that are compliance with applicable accessibility standards." (Dkt. No. 71, ¶¶ 132–34). Because it appears that Plaintiffs' professional malpractice claim seeks to shift the full amount of Plaintiffs' liability for FHA violations to Defendants, such the claim is a de facto indemnification claim which is preempted by the FHA.[9] Accordingly, the Court grants Defendants' motion to dismiss the professional malpractice claim (Count II).

## 2.    Assigned Claims

Defendants also argue that Plaintiffs' assigned claims for violation of the FHA and state fair housing laws are preempted by the FHA because compliance with the FHA is a "non-delegable duty" and allowing such claims would permit Plaintiffs to insulate themselves from liability. (Dkt. No. 74-52, at 18–19). Plaintiffs respond that the assigned claims are not preempted, noting that they will not receive a "windfall" by virtue of holding Defendants liable

---

[9] The Court agrees with the *Niles Bolton* court that an indemnification claim—contrary to a contribution claim, *supra* Section IV.A.1.a—which seeks to shift the *full* loss to another alleged violator of the FHA frustrates the purpose of the FHA and is therefore preempted.

for their own misconduct under the statutes and that Defendants have not explained how the FHA could "possibly 'preempt' claims arising under the FHA itself." (Dkt. No. 75-1, at 17–18).

The Court agrees with Plaintiffs that Defendants failed to establish how an FHA claim could be preempted by the FHA. But the parties' briefing is not sufficient to enable the Court to rule on Defendants' challenge to the assignment. Whether an FHA claim may be assigned is a question of federal law. *See, e.g.*, *DNAML Pty, Ltd. v. Apple Inc.*, No. 13-cv-6516, 2015 WL 9077075, at *3, 2015 U.S. Dist. LEXIS 168245, at *7–8 (S.D.N.Y. Dec. 16, 2015) (noting that "the issue of assignability of a federal statutory claim is itself an issue of federal law"); *Cooper v. Credit Mgmt., LP*, No. 22-cv-1011, 2022 WL 17995551, at *3 & nn.6 –7, 2022 U.S. Dist. LEXIS 232961, at *6–7 & nn.6–7 (N.D. Tex. Dec. 29, 2022) (collecting decisions that "persuasively reason that where a claim for relief is created by a federal statute, federal law governs the assignability of the claim").[10] While Defendants assert that it would be against public policy to permit assignment of an FHA claim, the parties failed to brief that issue adequately to permit a ruling.[11]

Nor did the parties adequately address whether the fact that the fair housing claims were purportedly assigned to entities who themselves may be liable under the fair housing laws for the same alleged violations and who settled those claims alters the assignability analysis. *Cf.*

---

[10] The parties' arguments do not make any distinction between the assigned FHA claims and the state-law fair housing claims in terms of assignability or what law governs that inquiry. *See, e.g.*, N.Y. Gen. Oblig. Law § 13-101 (providing that a claim may not be "transferred" when assignment is forbidden by statute or "would contravene public policy"). The Court notes that, although it appears that Plaintiffs purport to assert assigned claims under the FHA and New York, Ohio, Indiana, and Kentucky law, (*see* Dkt. No. 71, ¶¶ 144–61), the Assignors only assigned (1) the claims set forth in the original complaint, i.e., claims for violation of the FHA and NYSHRL; and (2) all claims the Assignors may have against Defendants for "design and construction-related violations of the FHA," (Dkt. No. 71-2, at 2). The basis for any assignment of claims under Ohio, Indiana, and Kentucky law is therefore unclear.

[11] Defendants' one-paragraph discussion of this issue cites only an out-of-Circuit case from 1979 which found that a plaintiff/assignee lacked standing to pursue a civil rights action. *Carter v. Romines*, 593 F.2d 823, 823 (8th Cir. 1979). And Plaintiffs failed to respond to the public policy argument.

*Ondimar Transportes Maritimos v. Beatty St. Props., Inc.*, 555 F.3d 184, 188–89 (5th Cir. 2009) (concluding, in the context of admiralty and maritime law, that "permitting a co-tortfeasor to settle with the injured party, obtain an assignment from that injured party, and proceed against the nonsettling potential tortfeasor is inconsistent with the goals of [maritime law's] proportionate liability framework"). Further, the amended complaint does not allege what, if any, interest remained for the Assignors to assign to Plaintiffs following the work agreed to and monies received by the Assignors in the settlement agreement. *See In re Nat'l Mortg. Equity Corp. Pool Certificates Sec. Litig.*, 636 F. Supp. 1138, 1148–49 (C.D. Cal. 1986) (addressing the question "whether a party who has been fully compensated for an injury nonetheless may assign its claims to someone else" and noting a concern with double recovery: "once an injured party is fully compensated for its injury, whether by a tortfeasor or someone else, its claim is extinguished by operation of law, and there simply is nothing remaining for the injured party to assign" (internal citation omitted)); *In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281, 309 (S.D.N.Y. 2005) (discussing *National Mortgage*), *rev'd on other grounds*, 503 F.3d 89 (2d Cir. 2007). Moreover, Plaintiffs have not addressed whether the assigned claims are de facto indemnification claims given that they seek to recover on the assigned claims compensatory damages that would "fully compensate each Plaintiff for the injuries caused by" Defendants' conduct, punitive damages, and attorneys' fees and costs. (Dkt. No. 71, at 37).[12]

In light of these questions, the Court cannot adjudicate Defendants' motion to dismiss as it relates to the assigned claims. This portion of Defendants' motion is therefore denied without

---

[12] The parties have not addressed whether all Plaintiffs and all of the properties currently at issue were encompassed by the settlement agreement.

prejudice to filing a renewed motion to dismiss or, to the extent resolution of these issues

depends on factual questions, to moving for summary judgment at an appropriate time.

### B.  Standing to Bring Assigned Claims

Defendants next move pursuant to Rule 12(b)(1) to dismiss the assigned FHA and state-

law human rights claims on the ground that Plaintiffs lack standing because they have not

"suffered a concrete and particularized injury from the alleged fair housing violations." (Dkt. No.

74-52, at 19–24). Plaintiffs respond that they have standing to assert the assigned claims based

on the Assignors' injuries. (Dkt. No. 75-1, at 18–22).

Article III of the Constitution provides that the judicial power of the federal courts

extends only to "Cases" or "Controversies." U.S. Const. art. III, § 2. "Whether a plaintiff

possesses standing to sue under Article III 'is the threshold question in every federal case,

determining the power of the court to entertain the suit.'" *Nat. Res. Defense Council v. Nat'l*

*Highway Traffic Safety Admin.*, 894 F.3d 95, 103 (2d Cir. 2018) (quoting *Warth v. Seldin*, 422

U.S. 490, 498 (1975)). To establish Article III standing, a plaintiff must demonstrate (1) an

injury in fact, "which means 'an actual or imminent' and 'concrete and particularized' harm to a

'legally protected interest'"; (2) that the injury is "fairly traceable" to the "challenged action of

the defendant"; and (3) redressability, which means it is "likely" that "a favorable decision by a

court will redress the injury." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61

(1992)). In *Sprint Communications Co., L.P. v. APCC Services, Inc.*, the Supreme Court

confirmed that "an assignee can sue based on his assignor's injuries." 554 U.S. 269, 286 (2008);

*see also Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773–74

(2000) (holding that a *qui tam* realtor has Article III standing to sue under the False Claims Act,

because the Act effects a "partial assignment of the Government's damages claim" and "the

assignee of a claim has standing to assert the injury in fact suffered by the assignor").

Here, Defendants argue that Plaintiffs do not have Article III standing to assert the FHA or state-law fair housing or human rights law claims because Plaintiffs themselves have "not suffered a concrete and particularized injury from the alleged fair housing violations." (Dkt. No. 74-52, at 22–24). However, Defendants have failed to address why, assuming the claims at issue were validly assigned, Plaintiffs do not have Article III standing to assert the assigned claims based on the *Assignors'* injuries under *Sprint*. *Sprint*, 554 U.S. at 286.[13] Defendants recognize yet seek to downplay the Supreme Court's holding in *Sprint*, relying instead on *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394 (2d Cir. 2018). In *John Wiley*, the Second Circuit considered whether the plaintiff, a "putative assignee of the bare right to sue for [copyright] infringement" but who did not have "an exclusive right under copyright" in any of the photographs at issue, could pursue an infringement claim under the Copyright Act. *Id.* at 398–99. The Second Circuit held that the text of the Copyright Act limits those who may bring suit under the Act and, because the plaintiff-assignee was not among the class of persons entitled to bring suit under the statute, the plaintiff "may not bring a cause of action for copyright infringement." *Id.* at 404–07, 415; *see* 17 U.S.C. § 501(b) ("The *legal or beneficial owner of an exclusive right* under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." (emphasis added)). The court rejected the argument that the Supreme Court's decision in *Sprint* foreclosed its decision and expressly noted that *Sprint* "focused on constitutional and prudential standing." *John Wiley*, 882 F.3d at 407. However, the court also noted that "assignability of litigation claims is not universally countenanced" and that patent and copyright are unique areas of law. *Id.* at 408 ("Even in the

---

[13] The parties do not dispute the traceability and redressability elements of Article III standing.

context of congressionally created causes of action, federal law does [not uniformly] permit suit based on a bare assigned claim.").

The Court concludes that *John Wiley* is distinguishable and not controlling here. Significantly, the case did not involve Article III standing but the distinct question of whether the plaintiff had a right to sue under the Copyright Act, a question formerly termed "statutory standing." *See id.* at 402 n.4 (explaining that the phrase "statutory standing" referred in that context to "a plaintiff's right to pursue a cause of action under the Copyright Act"). The Second Circuit did not hold that the plaintiff could not satisfy Article III standing requirements, including injury in fact. *John Wiley* therefore presents no compelling reason to disregard *Sprint*'s central holding that an assignee may sue based on an assignor's injury.[14]

Accordingly, the Court denies Defendants' motion to dismiss the assigned claims for lack of Article III standing.

## C.     Statute of Limitations

Finally, Defendants argue that Plaintiffs' claims for breach of contract and professional malpractice with respect to fourteen projects must be dismissed as time-barred. (Dkt. No. 74-52, at 24–27 (identifying the 14 projects)). To support this argument, Defendants attach to their motion and reply brief a number of documents relating to the relevant projects, including contracts, closeout letters, certificates of occupancy, certificates of substantial completion, and final invoices. (Dkt. Nos. 74-5 through 74-51; Dkt. Nos. 76 through 76-28). Plaintiffs respond that it is not clear on the face of the amended complaint that any of their claims is untimely and

---

[14] To the extent Defendants intend to challenge Plaintiffs' "statutory standing," i.e., Plaintiffs' right to bring a cause of action under the FHA and the other state statutes, the Court cannot evaluate that argument in light of the identified issues regarding the assigned claims. *Supra* Section IV.A.2.

that the outside documents submitted by Defendants must not be considered. (Dkt. No. 75-1, at 22–26).

"[A] statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)). "Because the statute of limitations is an affirmative defense, Defendants carry the burden of showing that Plaintiff failed to plead timely claims." *Smith v. City of New York*, 1 F. Supp. 3d 114, 118 (S.D.N.Y. 2013). "Dismissing claims on statute of limitations grounds at the complaint stage 'is appropriate only if a complaint clearly shows the claim is out of time.'" *Id.* (quoting *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)).

As an initial matter, the Court declines to consider the documents submitted by Defendants. "Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). However, a complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Id.* (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks omitted)). "[I]f material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Faulkner*, 463 F.3d at 134 (quoting

Fed. R. Civ. P. 12(d)). Although the amended complaint references the contracts entered into between the parties with respect to the projects, the amended complaint makes no reference to the other documents Defendants submitted. Nor are those other documents integral to the amended complaint. Further, because consideration of the contracts would not alter the analysis of Defendants' statute of limitation argument, the Court declines to consider the outside documents.

Under New York law, a cause of action against a design professional, "whether the claim is based upon breach of contract or malpractice," is subject to a three-year statute of limitations period. *Sendar Dev. Co., LLC v. CMA Design Studio P.C.*, 890 N.Y.S.2d 534, 537 (1st Dep't 2009); *see* CPLR 214(6) (setting three-year limitations period for "an action to recover damages for malpractice, other than medical, dental or podiatric malpractice, regardless of whether the underlying theory is based in contract or tort").[15] Such a claim "accrues upon 'termination of the professional relationship'—that is, when [the architect] 'completes its performance of significant (i.e. non-ministerial) duties under the parties' contract.'" *N.Y. City. Sch. Constr. Auth. v. Ennead Architects LLP*, 49 N.Y.S.3d 462, 463 (1st Dep't 2017) (citation omitted).

The Court concludes that Defendants have not met their burden of showing that Plaintiffs failed to plead timely breach of contract and professional malpractice claims. As the parties agree, such claims accrue upon the termination of the professional relationship. Although Defendants note that the amended complaint "denotes the respective dates upon which [Plaintiffs] entered into contracts with Mussachio" for the projects "with dates ranging from 2010—2016," (Dkt. No. 76-29, at 12; *see also* Dkt. No. 71, ¶¶ 61–94), the amended complaint

---

[15] The parties appear to agree that New York law governs Plaintiffs' breach of contract and professional malpractice claims, and Plaintiffs do not contest that those claims are subject to a three-year limitations period.

does not allege the dates on which the parties' professional relationship *ended* under each

contract. Because it is not clear from the face of the amended complaint when Plaintiffs' breach

of contract and professional malpractice claims accrued, the Court cannot say as a matter of law

that any of Plaintiffs' claims is untimely.

Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' breach of

contract and professional malpractice claims without prejudice to raising the defense at a later

time.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants Mussachio Architects P.C. and Marc Mussachio's motion to

dismiss (Dkt. No. 74) is **GRANTED in part**; and it is further

**ORDERED** that Plaintiffs' professional malpractice claim (Count II) is **DISMISSED**

**with prejudice**; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 74) is otherwise **DENIED**

without prejudice to filing a renewed motion to dismiss as to the assigned claims or, to the extent

resolution of these issues depends on factual questions, to moving for summary judgment at an

appropriate time. Any renewed motion to dismiss the assigned claims must be filed by July 5,

2023.

**IT IS SO ORDERED.**

Dated: June 7, 2023
         Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

25

**APPENDIX**
(all citations to the amended complaint (Dkt. No. 71))

| Plaintiff | Associated Properties |
|---|---|
| Clover Communities Beavercreek LLC | Lakeview Senior Apartments (Ohio) (¶¶ 10, 61) |
| Clover Communities Berea LLC | Sheldon Square Senior Apartments (Ohio) (¶¶ 11, 62) |
| Clover Communities Bethel Park LLC | Bethel Square Senior Apartments (Pennsylvania) (¶¶ 12, 63) |
| Clover Communities Brighton LLC | Beaver Run Senior Apartments (Pennsylvania) (¶¶ 13, 64) |
| Clover Communities Camillus LLC | Camillus Point Senior Apartments (New York) (¶¶ 14, 65) |
| Clover Communities Hamilton LLC | Eden Park Senior Apartments (Ohio) (¶¶ 15, 66) |
| Clover Communities Independence LLC | Eastland Court Senior Apartments (Missouri) (¶¶ 16, 67) |
| Clover Communities Johnson City, LLC | Reynolds Pointe Senior Apartments (New York) (¶¶ 17, 68) |
| Clover Communities Lorain LLC | Lorain Point Senior Apartments (Ohio) (¶¶ 18, 69) |
| Clover Communities North Fayette, LLC | Lafayette Square Senior Apartments (Pennsylvania) (¶¶ 19, 70) |
| Clover Communities Scranton, LLC | Green Ridge Senior Apartments (Pennsylvania) (¶¶ 20, 71) |
| Clover Communities Sylvania LLC | Kings Pointe Senior Apartments (Ohio) (¶¶ 21, 72) |
| Clover Communities Taylor LLC | Oak Hill Senior Apartments (Pennsylvania) (¶¶ 22, 73) |
| Wellclover Holdings LLC | Huntington Square Apartments, Glenwood Square Apartments, Southpark Square Senior Apartments, Willoughby Hills Senior Apartments, Fairfield Village Senior Apartments, Ivy Pointe Senior Apartments (all in Ohio); and Morgan Square Senior Apartments (New York) (¶¶ 23, 74–80) |

| Plaintiff | Associated Properties |
|---|---|
| Clover Communities Painesville LLC | Heisley Park Senior Apartments (Ohio) (¶¶ 24, 81) |
| Clover Communities Miamisburg LLC | Sycamore Creek Senior Apartments (Ohio) (¶¶ 25, 82) |
| Clover Communities Olmsted Falls LLC | Olmstead Falls Senior Apartments (Ohio) (¶¶ 26, 83) |
| Clover Communities Rossford LLC | Simmons Crossing Senior Apartments (Ohio) (¶¶ 27, 84) |
| Clover Communities Hempfield LLC | Towne Square Senior Apartments (Pennsylvania) (¶¶ 28, 85) |
| Clover Communities Hendricks LLC | Wynbrooke Senior Apartments (Indiana) (¶¶ 29, 86) |
| Clover Communities Indianapolis LLC | Pleasant Run Senior Apartments (Indiana) (¶¶ 30, 87) |
| Clover Communities McCordsville LLC | Gardens on Gateway (Indiana) (¶¶ 31, 88) |
| Clover Communities Bardstown LLC | Glenmary Grove Senior Apartments (Kentucky) (¶¶ 32, 89) |
| Clover Communities Ormsby LLC | Lyndon Square Senior Apartments (Kentucky) (¶¶ 33, 90) |
| Clover Communities Robinson LLC | Cedar Ridge Senior Apartments (Pennsylvania) (¶¶ 34, 91) |
| Clover Communities Southpoint LLC | Preston Village Senior Apartments (Kentucky) (¶¶ 35, 92) |
| Clover Communities Tucker LLC | Tucker Station Senior Apartments (Kentucky) (¶¶ 36, 93) |
| Clover Communities Urton LLC | Meridian Hills Senior Apartments (Kentucky) (¶¶ 37, 94) |